AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    **25-mj-00576** |
| T-Mobile | ) | |
| 4 Sylvan Way, Parsippany, NJ 07054, re number: (760) 562-4468 | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. sec. 1119,  2261 | Foreign Murder of United States Nationals and Interstate Domestic Violence |

The application is based on these facts:

See attached Affidavit of FBI TFO James Escalante, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*James N. Escalante*

_____
*Applicant's  signature*

Task Force Officer James Escalante, FBI

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:   2/7/2025

*Alison H. Goddard*

_____
*Judge's signature*

City and state:  San Diego, California          Hon. Allison H. Goddard, U.S. Magistrate Judge

_____
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT

I, James N. Escalante, Task Force Officer, Federal Bureau of Investigation (FBI), being duly sworn, hereby state as follows:

1.    This affidavit is in support of application by the United States of America for search warrants for T-Mobile ("T-Mobile"), located in Parsippany, New Jersey, and Charter Communications Inc. ("Charter Communications"), located in St. Louis, Missouri, Verizon Wireless (Verizon), located 180 Washington Valley Road, Bedminster, New NJ 07921, as described in Attachments A-1, A-2, and A-3 to search the account associated with the following cellular telephone numbers:

    a.    Phone Number: (760) 562-4468 ("**Subject Account 1**") operated by T-Mobile and believed to be used by Adult Female 1 (**"AF1"**) the victim of a homicide on or before January 20, 2025, in Mexicali, Baja California (B.C.), Mexico; and

    b.    Phone Number: (760) 996-5511 ("**Subject Account 2**") operated by Charter Communications Inc. and believed to be used by DANNY FIGUEROA, who was identified at the scene of the homicide and the principal subject in Mexicali, B.C., Mexico; and

    c.    Phone Number: (760) 996-5511 ("**Subject Account 2**") operated by Verizon Wireless and believed to be used by DANNY FIGUEROA, who was identified at the scene of the homicide and the principal subject in Mexicali, B.C., Mexico;

(collectively the "**Subject Accounts**") for subscriber information, telephone toll data, and cell-site geolocation data from January 10, 2025, through and including January 28, 2025. There is probable cause that these records and information

constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, U.S.C., Section 1119 (Foreign murder of United States Nationals) and Title 18 U.S.C., Section 2261 (Interstate Domestic Violence) ("Target Offenses") as described in Attachment B. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), which applies to providers of electronic communication services. In this case, as will be shown below, T-Mobile and Metro PCS provides electronic communication services in the form of cellular and wireless telephone service for the subject account.

<u>EXPERIENCE AND TRAINING</u>

2.      I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 1119.

3.      I am a Special Agent with Customs and Border Protection, Office of Professional Responsibility (CBP/OPR), deputized as a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), in Imperial CA.  As a federal agent, I am authorized to investigate violations of laws pertaining to the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.  I am currently assigned to the Imperial Country Resident Agency of the San Diego Field Office and over the past 22 years, your affiant has led or participated in hundreds of criminal investigations related to public corruption, narcotics, human trafficking, child pornography, fraud, crimes against persons, alien smuggling, civil rights violations, bribery, assaults, theft, financial violations, death investigations, interstate communications, murders of United States citizens in foreign countries and violent crimes.

4.    I have been a deputized TFO with the FBI since 2016. I have been employed as a Federal Agent with the Department of Homeland Security (DHS) since March of 2002. I attended a 20-week, full-time basic U.S. Border Patrol Agent Academy at the Federal Law Enforcement Training Center from which I graduated in August of 2002. I attended a 12-week full-time Criminal Investigator Academy at the Federal Law Enforcement Training Center from which I graduated in 2010. I attended and graduated from the U.S. Coast Guard Maritime Federal Law Enforcement Academy centered in Yorktown, Virginia from which I graduated from in 1998.

5.    Over the course of my career, I have also received a wide variety of training and utilized various investigative techniques commonly used in support of the DHS and FBI investigative properties. I have received training in interviewing and interrogation techniques, law enforcement tactics, arrest procedures, physical and electronic surveillance, the execution of searches and seizures, crime scene preservation, and instruction in various criminal laws and procedures. I am a law enforcement officer, authorized to investigate violations and execute warrants issued under the authority of the United States.

6.    Prior to my employment with the CBP/OPR I was employed as a Special Agent with the DHS, Office of Inspector General (OIG), where I conducted complex criminal investigations related to public corruption and federal violations. Prior to my employment with DHS/OIG, I was employed as a U.S. Border Patrol Agent (BPA) for eight years and assigned to El Centro, CA. During my time with the U.S. Border Patrol, I made hundreds of arrests for immigration, narcotics, and other federal violations. I was also assigned to the Imperial Valley Border Enforcement Security Task Force (IVBEST) and conducted numerous criminal investigations related to narcotics trafficking, alien smuggling, firearms violations, violent crimes, murder, assaults on federal officers, and human trafficking. I served

in the U.S. Coast Guard as a Non-Commissioned officer, having obtained the rank of Petty Officer 2nd Class and was honorably discharged following four years of total service. During my time in the U.S. Coast Guard, I was certified as a Federal Bordering Officer and enforced all applicable federal laws rules and regulations with the jurisdiction of the U.S.

7.      In connection with Foreign Murder of United States Nationals and Interstate Domestic Violence violations in which I have either training or experience in investigating, as well as upon information related to me by other individual(s), including conversations with other law enforcement officers, I am familiar with the methods used by individuals who commit such crimes. These types of crimes are typically planned in advance by the individuals committing these types of crimes. At times these individuals communicate and coordinate with others prior to, during and after each event using cellular/wireless telephones. Furthermore, in most crimes, surveillance of the targeted location is conducted prior to the attempt. Criminals who commit these kinds of crimes also typically bring their phones with them when planning, coordinating and carrying out the crime.

8.      The following is based on my own investigation, reports written by other law enforcement agents, consultation with other law enforcement agents and officers experienced in investigating violent crimes, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Dates and times are approximate.

### STATEMENT OF PROBABLE CAUSE

9.     The FBI is investigating the suspected murder of AF1 and her unborn child (hereinafter "V2") that may have occurred in Mexicali, Baja California (B.C.), Mexico on or before January 20, 2025.

10.     According to information conveyed to the FBI by TFO Johnny Pestano, on January 21, 2025, TFO Pestano was contacted by family members of AF1 and advised that she was found deceased in Mexicali, Mexico. The information was provided to your affiant along with an article for a local media platform. The information from the media article indicated AF1 was pregnant when she was allegedly killed. The FBI coordinated with DHS and CBP Attache's and Foreign Operations Branch units to obtain further information regarding the incident. The DHS Attache's and CBP FOBs informed the FBI of AF1's full identity and indicated the Government of Mexico (GOM) identified the primary suspect for the alleged murder of AF1 and V2 as Danny FIGUEROA-Ochoa, also known as Danny OCHOA-Figueroa and Dany OCHOA-Figueroa (hereinafter "FIGUEROA"), a U.S. citizen (USC). FIGUEROA was identified to be the romantic partner of AF1.

11.     The FBI conducted record reviews of AF1 which revealed she was a USC and resided in Calexico, CA. The FBI identified the known telephone numbers and social media accounts for AF1. The record reviews of AF1 did not reveal any criminal history or encounters with law enforcement. The record reviews revealed AF1 entered the U.S. from Mexico through the Calexico Port of Entry (POE) with FIGUEROA in a white 2019 Kia Forte sedan, with a California (CA) License Plate of 9MNA237. The 2019 Kia Forte was identified as being registered to AF1 at a residence in Calexico, CA. AF1 was identified as last entering the U.S. from Mexico through the Calexico POE on January 18, 2025, at 9:22 p.m., Pacific Standard Time (PST) with FIGUEROA in CA/9MNA237.

12.     The FBI conducted record reviews of FIGUEROA and revealed he was a convicted felon and currently on federal probation. FIGUEROA was identified as being arrested on June 13, 2016, for attempting to smuggle 28.28 kilograms of methamphetamine into the U.S. from Mexico and was convicted of a felony. FIGUEROA was identified as being arrested on May 10, 2020, for attempting to smuggle 12.18 kilograms of methamphetamine into the U.S. from Mexico and was convicted of a felony. FIGUEROA was arrested on January 13, 2024, for violation of his federal probation. The reviews revealed FIGUEROA was a USC who previously resided in El Centro, CA. The reviews revealed FIGUEROA was associated to 6 different telephone numbers. Narcotics smugglers often utilize multiple telephones to avoid detection from law enforcement when engaged in illicit acts. The reviews revealed FIGUEROA had entered the U.S. with AF1 on 3 occasions in the last 12 months. FIGUEROA entered the U.S. with AF1 on October 12, 2024, at 3:34 a.m. PST, on January 18, 2025, at 12:54 a.m. PST, and on January 18, 2025, at 9:22 p.m. PST. All the crossing were in AF1's vehicle of CA/9MNA237 and through the Calexico POE.

13.     The FBI interviewed the sister of AF1 (hereinafter "MC"). MC stated AF1 and FIGUEROA were engaged to be married on February 1, 2025, and resided in a studio apartment located at 501 De Las Flores Street, Calexico, CA (hereinafter "Residence"). MC stated AF1 was approximately 4 months pregnant. MC stated the landlords at the Residence had a video surveillance system that monitored the property. MC provide the FBI with the current telephone numbers used by AF1 as (760) 562-4468 and FIGUEROA as (760) 996-5511. MC stated she was advised by the GOM they were investigating the suspected murder of AF1 and had arrested FIGUEROA for an unrelated narcotics warrant. MC stated she was advised by the GOM that FIGUEROA was a primary suspect in the murder investigation.

14.    MC stated she was advised by her mother, MR (hereinafter "MR") that on January 18, 2025, AF1 informed MR via telephone that she was traveling with FIGUEROA to Bakersfield, CA, to meet FIGUEROA's father.  MC stated MR informed her it was approximately 10:00 p.m. when AF1 and FIGUEROA departed from the Residence and proceeded to Bakersfield, CA.  MC stated AF1 called MR in the morning of January 19, 2025, and informed her they were in Bakersfield, CA.  MC stated AF1 allowed MR to see her phone's location so MR could see where she was at.

15.    MC stated AF1's telephone was observed by MR as traveling back toward Imperial County on January 19, 2025.  MC stated MR informed her that when she checked the location of AF1's telephone it appeared that she traveled directly from Bakersfield to Mexicali, Mexico.  MC stated on January 19, 2025, approximately 7:15 p.m., FIGUEROA was observed on the cameras at the Residence arriving in CA/9MNA237 and entering the studio apartment alone.  FIGUEROA was observed leaving the Residence a few minutes later, entering CA/9MNA237, and traveling southbound from the location.

16.    MC stated MR continued to monitor AF1's cellular telephone location and noticed it had not moved from a location in Mexicali, Mexico for several hours.  MC stated MR called AF1 on multiple occasions and was unable to communicate with her.  MC stated MR became worried and traveled to Mexicali, Mexico to the last known location of AF1's cellular telephone.  MR was unable to locate AF1 or the cellular telephone.  MR proceeded to the Mexicali Police and reported that her daughter, AF1 was missing and not answering her phone.

17.    On January 22, 2025, the FBI proceeded to the Residence which is located at the corner of De Las Flores Street and VV Williams Street in Calexico, CA.  The FBI communicated with the property managers of the Residence to review the video footage of the location.  A review of the video footage at the Residence

7

revealed on January 18, 2025, AF1 and FIGUEROA were observed leaving the Residence at 10:15 p.m. PST in CA/9MNA237. The video footage showed on January 19, 2025, 6:54 p.m. PST, CA/9MNA237 arrived at the Residence with two occupants and parked on VV Williams Street. FIGUEROA exited the vehicle and entered the apartment alone wearing blue jeans, a black hoodie sweater and a black baseball cap. The other occupant remained in CA/9MNA237. At 6:59 p.m. PST FIGUEROA exited the Residence and proceeded to CA/9MNA237 where he was observed talking to the other occupant in the vehicle. At 7:00 p.m. PST, FIGUEROA proceeded back inside the Residence alone and was observed to be wearing a light-colored cowboy hat, black short sleeve t-shirt with the lettering of "Heavy on the Thank You God", and light-colored pants. At 7:01 p.m. PST an illumination of a cellular device was observed inside the vehicle while FIGUEROA was still in the Residence. This confirmed there was a second person in CA/9MNA237. At 7:02 p.m. PST, FIGUEROA exited the apartment wearing a jacket. FUGUEROA entered CA/9MNA237 and proceeded southbound on VV Williams Street.

18. A review of the crossings associated to CA/9MNA237 revealed the vehicle departed from the U.S. into Mexico on January 19, 2025, 7:07 p.m., PST through the Calexico West Port of Entry. The crossing was at night and the captured photographs did not capture the occupants of the vehicle. The driving distance from the Residence where FIGUEROA was observed leaving at 7:02 p.m. PST is 1.3 miles from the Calexico Port of Entry.

19. On January 20, 2025, at 9:12 a.m., the Mexicali Police received a 911 call from a concerned citizen that stated there was a deceased female at a construction site near Avenida Alba, Colonia Nueva Amanacer, Mexicali, Mexico. The Mexicali Police and Emergency Medical Services (EMS) responded to the scene and discovered a deceased female laying face up on the ground and covered

with multiple black jackets. The female's purse and personal belongings were located near her body and included a California Driver's License and a U.S. passport. A review of the identification documents by the GOM confirmed the identity of AF1. The Mexicali Police initially believed AF1 may have been involved in some sort of vehicle accident. After a closer examination of the scene the Mexicali Police suspected AF1 was murdered and placed at the location where she was discovered. The GOM initiated their murder investigation and began to process the scene.

20. On January 24, 2025, the FBI met with the Calexico Police Department and the GOM Baja California Attorney's Generals Investigation Office in Calexico, CA. GOM Investigator Enrique Trujillo stated the Mexicali Police questioned persons in the area where AF1 was located to determine if they knew her or had witnessed anything. During the interviews the Mexicali Police observed a male subject walking from a Liquify Petroleum Gas (LPG) Station approximately 65 yards away from where AF1 was located. The male subject was identified as FIGUEROA by his CDL. FIGUEROA was asked if he knew AF1 and if he witnessed anything in the area. FIGUEROA advised the Mexicali Police he did not know AF1 and had not seen anything. The Mexicali Police conducted record reviews of FIGUEROA in GOM databases and determined he had a warrant in Mexico for narcotics trafficking. FIGUEROA was placed under arrest for the violation. FIGUEROA was wearing the same black shirt he was observed leaving the Residence with on January 19, 2025.

21. The Mexicali Police proceeded to the LPG Station where FIGUEROA was observed walking from and discovered his mother lived and worked at the location. Inside a room at the LPG Station the Mexicali Police located a ring with the name "Michelle" engraved in it. The Mexicali Police located a black Nissan Altima, with a license plate of CA/7RYS678 with vehicle damage parked at the

LPG Station.   The Mexicali Police conducted record reviews of CA/7RYS678 in GOM databases and determined license plate CA/7RYS678 belonged to a Toyota and was for the Nissan Altima.  The vehicle was impounded by the Mexicali police and during an inventory of the vehicle the Mexicali Police discovered a key chain with the names "Danny" and "Michelle", a used pregnancy test, a female coin pouch, and other female accessories.  This information indicated FIGUEROA had lied to the Mexicali Police regarding his association to AF1.

22.    The FBI received the photographs from the GOM of the scene where AF1 was located.  A review of the scene photographs revealed AF1 was wearing a black shirt, blue jeans with black and white shoes.  AF1 was covered with two black jackets and was lying face up on what appeared to be a rudimentary gurney comprised of rebar and flat metal materials.  Lying next to AF1 was a large metal construction level and a plastic bottle of Coke Cola.  Located near AF1 were two black colored plastic vehicle parts that were determined to be wheel well covers. One of the vehicle parts had an inscription that indicated it belonged to a Kia.  The FBI conducted reviews and discovered the Kia vehicle part was for a 2019 to 2021 Kia vehicle.  Also located near AF1 was another black jacket and a purse that was determined to belong to her.  AF1 appeared to have severe injuries to head, face, chest and neck areas.

23.    The FBI was advised FIGUEROA was transported to the CERESO Jail in Mexicali, Mexico, and charged with possession with intent to distribute methamphetamine.

24.    The FBI received the GOM autopsy photographs which showed AF1 had injuries to the back of her head, lacerations to her right neck area, multiple large bruises and scrapes to her chest and sides, abrasions to her forehead, face, nose, and a circular scrape to her right leg above the knee.  The photographs did not reveal any significant injuries to AF1's legs for lower body area.  The FBI was advised by

10

the GOM their investigation did not reveal any significant injuries to AF1's lower body and that AF1 died from the multiple injuries she sustained to her upper body area.

25.    The FBI was advised by the GOM that CA/9MNA237 was not recovered at the LPG Station and the vehicle's current whereabouts were unknown. The GOM stated they tracked the vehicles movements utilizing license plate readers in Mexicali, Mexico and observed that it was last observed traveling toward an area in Mexicali where there are a lot of salvage yards.   The GOM indicated they continue to search for CA/9MNA237 in Mexicali, Mexico.  The GOM stated AF1's cellular telephone was last reported to be near the U.S. / Mexico border and was not near where AF1 was located.   The GOM stated they had not recovered AF1's cellular telephone, and they continue to search for the device.  The GOM stated they found a different cellular telephone in the black Nissan Altima they believed was being utilized by FIGUEROA in Mexico.

26.    On January 27, 2025, the FBI interviewed "LA", who was the brother of the property manager ("LA1") for AF1 and FIGUEROA.  LA stated he met FIGUEROA through LA1 on one or two occasions.  LA stated there was some discussion about hiring FIGUEROA for a trucking business, but they decided to not hire him.  LA stated he owned Junkyard 686 in Mexicali, Mexico. LA stated FIGUEROA did not take CA/9MNA237 to his junkyard to be scrapped or hidden.  LA stated FIGUEROA did not obtain the black Nissan Altima for his junkyard.

27.    On January 30, 2025, the FBI interviewed MR who stated she was the mother of AF1.  MR stated she asked AF1 to share her location with her because MR did not trust FIGUEROA.  MR stated FIGUEROA would often disappear for days at a time and AF1 would not know here he was.  MR stated on January 17, 2025, during the evening hours she observed AF1's telephone

moving east and west on 1st Street in Calexico, CA. MR went to the area and observed the Honda sedan, CA/5GQU391, that her husband, "RR" allowed FIGUEROA to use, parked by the border fence on 1st Street. MR went the Residence to talk to AF1. When MR arrived at the Residence, she called AF1 and advised her she was outside with some fruit for her. AF1 did not want to come out and said she did not feel well. On January 18, 2025, after midnight, MR observed AF1's phone had departed from the Residence and proceeded to Mexicali, Mexico. After crossing border AF1's phone was observed traveling to a neighborhood in Mexicali called Islas Agrarias / Portalles. The location is known by U.S. and GOM law enforcement agencies to be associated to cartel activity. MR stated AF1 was not in Mexico for long and returned to the U.S.

28.    The crossing information from the Calexico POE showed that AF1 and FIGUEROA entered the U.S. from Mexico on January 18, 2025, at 12:54 a.m. PST through the Calexico POE.

29.    MR stated she called AF1 to see if everything was ok. AF1 stated she was fine, and she was taking FIGUEROA to pick up the Honda sedan that was parked on 1st Street. MR stated AF1 and FIGUEROA were observed traveling to Brawley and returned the Residence around 3:00 a.m. PST.

30.    MR stated on January 18, 2025, around 10:00 p.m., PST AF1 and FIGUEROA departed from the Residence and traveled to Earlimart, CA, near Bakersfield, CA, so that AF1 could meet FIGUEROA's father. MR stated she received a text message from AF1 around 7:58 a.m. PST informing her they had arrived in Earlimart, CA. MR stated on January 19, 2025, around 11:00 a.m., PST, AF1's telephone was observed traveling back toward the Imperial County. MR stated when it was dark outside, she noticed AF1's telephone was passing Brawley, Imperial and Calexico. MR stated at approximately 7:00 p.m. PST, she observed AF1's telephone was at "Lopez Mateos" "Primera" in Mexicali,

12

Mexico.   The address for that location is Blvd. Adolfo Lopez Mateos 598, Primera, Mexicali, B.C., Mexico.   MR stated AF1's phone did not move from that location.   The last location of AF1's telephone was approximately 200 to 300 yards south of the U.S. / Mexico border fence.

31.   MR stated at 9:30 p.m. PST she became nervous because AF1's location had not changed, and she was answering text messages or phone calls. MR stated FIGUEROA was also not answering text messages of phone calls. MR stated AF1 also answers her text or phone calls and always has her phone charged.   MR stated on January 20, 2025, in the morning she told RR to go look for AF1 at the 598 Lopez Mateos area in Mexicali.   MR stated RR told her he did not locate AF1, AF1's phone or CA/9MNA237.

32.   MR stated later in the afternoon on January 20, 2025, she went with her friend, "A2", to Mexico to look for AF1.   MR stated they went to the 598 Lopez Mateos area and did not find AF1.    During this time MR had continued to call AF1 and FIGUEROA.   MR went to the Mexicali Police Station located at Plaza Cachanilla to report her daughter was missing.   MR was advised to go to another police station in Mexicali where she could file a missing person report. MR stated she proceeded to the police station and filed a missing persons report and provided all information regarding AF1 and FIGUEROA.   The Mexicali Police search their databases which revealed FIGUEROA was already in custody in Mexico.   The Mexicali Police provided MR with a document and directed to another police station.   MR stated at the next police station the Mexicali Police questioned her about FIGUEROA.   MR requested to know about AF1 and after a brief period they advised her, A2 and RR that AF1 and V2 were killed.

33.   As of January 30, 2025, the GOM of Mexico has indicated that FIGUEROA has not cooperated with authorities and has not been the subject of an interview.   The FBI investigation thus far has determined that FIGUEROA

was the last known person to be with AF1 in the U.S. prior to her death. FIGUEROA was located near the area where AF1 was discovered and then lied to GOM officials when asked if he knew AF1.  FIGUEROA was reportedly paranoid and had been arrested in December of 2024, for using methamphetamine.  The FBI learned of potential infidelity by AF1 that was discovered by FIGUEROA during a conversation he had with LA1.  AF1 was found to be with all her belongings and was covered with jackets.  AF1's vehicle and cellular telephone are both missing in Mexicali, Mexico.  FIGUEROA was the last person who was observed operating CA/9MNA237.  AF1's family members informed the FBI that FIGUEROA would occasionally disappear for days at a time and believed unidentified persons were looking for him.

## The **Subject Accounts**

34.    On January 22, 2025, the FBI was informed by MC that (760) 562-4468 **(Subject Account 1)** was the number attached to AF1's cellular telephone of which was last known to be near the 598 Lopez Mateos area in Mexicali, Mexico.

35.    Open-source checks conducted by the FBI on January 23, 2025, confirmed open-source information attributed **Subject Account 1** to AF1.

36.    On January 22, 2025, the FBI was informed by MC that (760) 996-5511 **(Subject Account 2),** was number attached to FIGUEROA's cellular telephone.

37.    On January 30, 2025, the FBI was advised by MR that (760) 996-5511 **(Subject Account 2)** was the number attached to FIGUEROA's cellular telephone.

38.    Based on my training and experience, I have learned that T-Mobile, Verizon, and Charter Communications Inc. are companies that provide cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide

14

service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

39. Based on my training and experience, I know that T-Mobile, Verizon, and Charter Communications Inc. can collect cell-site data about the **Subject Accounts**. I also know that wireless providers such as T-Mobile, Verizon, and Charter Communications Inc. typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

40. Based on my training and experience, I know that wireless providers such as T-Mobile, Verizon, and Charter Communications Inc. typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile, Verizon, and Charter Communications Inc. typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional

records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users of the Subject Phone and may assist in the identification of co-conspirators and/or victims.

41. Based on my training and experience, and my consultation with other law enforcement officers, I am aware that T-Mobile, Verizon, and Charter Communications Inc. routinely collect and store data for the electronic communication accounts to which it and other providers issue telephone numbers. The data includes: (i) subscribers' contact and billing information; (ii) detailed information concerning subscribers' incoming and outgoing telephone calls; (iii) detailed information concerning subscribers' outgoing direct calls, text message, and SMS messages; and (iv) detailed information concerning cell-site geo-location data.

42. In particular, I know that cell phones connect to a provider's network through cell towers or cell sites. The particular tower or site may change as a phone moves from one location to another. Providers automatically record and retain this connection data as part of the **Subject Accounts**. Records and data identifying the towers or sites to which a phone connected therefore tend to identify the phone's and phone user's location at particular times.

43. Investigators believe that obtaining this information from the communications providers for **Subject Accounts** will determine locations the unknown subjects traveled to following the conduct of the suspected murder of AF1 and V2. The information sought by the Government will also allow investigators to determine whether there was a motive attributed to FIGUEROA and if he conspired with others for the suspected murder of AF1 and V2. Obtaining the data requested by this search warrant will allow investigators to confirm locations of the **Subject Accounts** before and following the incident. This search warrant will also reveal

16

any communications made deriving from **Subject Account 1** to and from **Subject Account 2,** prior to, during, and/or following the incident.

44.    Based on my training, experience, communication with investigators, and from the investigation as described above, I believe records contained within the Subject Accounts will contain evidence pertaining to the Target Offenses, cell tower data that will tend to show information regarding AF1, FIGUEROA, and the presence of the unknown subjects before and after the incident, and information to confirm whether communication was made between any unknown subjects and FIGUEROA.

45.    Based on my training, experience, historical cell detail records are relevant and material to the investigation of individuals who commit the Target Offenses, because such information can help identify the subjects and the physical location of the subjects' cellular telephone at the time of the crime. A subject will often communicate on a cellular telephone prior to, during, and after the commission of a crime – including checking with accomplices about possible police presence. In addition, even though the subjects may not be actively on the cellular telephone during the commission of the crime, the cellular telephone may receive a text or an incoming call that the subject was not anticipating, thereby indicating the telephone's location.

46.    Further, based on my training, experience, knowledge of the investigation, and consultation with law enforcement agents who have training and experience in violent crimes, I know that T-Mobile, Verizon and Charter Communications Inc. accounts may generate and store geolocation data that would constitute relevant evidence in this investigation. That data would include not only a presence during or around the time of the crime, but also location data that may corroborate or refute information provided by witnesses. The location data may also demonstrate an association amongst co-conspirators and others.

17

47.     Based on my training and experience, I know that in the days and weeks after a crime, it is common for co-conspirators to communicate about their exposure and risks of apprehension, the destruction of evidence, and law enforcement efforts.

48.     Information is being sought for the time frame of January 10, 2025, 12:00 a.m. (PST) through January 25, 2025, 11:59 p.m. (PST).  This timeframe encompasses the duration of the date range which the investigation understands to be a relevant period encompassing any planning of the crime, the timeframe in which investigators believe the crime took place, potential co-conspirators involved in the crime, as well as subjects attempting to hide or conceal the proceeds of the crime. By requesting the complete time frame of records, your Affiant believes law enforcement will be able to determine locations of **Subject Account 1** (AF1's phone) following the incident, as well as communications made deriving from **Subject Account 2** (FIGUEROA's phone), prior to, during, and following the incident to determine any communication held between AF1 and FIGUEROA and any unknown suspects.

49.     Based on my training and experience, individuals involved in planned murder conspiracies will often conduct surveillance or reconnaissance of a victim prior to committing said offenses.  Additionally, after the commission of a violent crime, it is common for subjects to destroy evidence, meet with co-conspirators, or travel to speak with and/or intimidate potential witnesses. Consequently, investigators believe that location data collected by T-Mobile, Verizon and Charter Communications Inc. for the above noted subject accounts may constitute evidence of the Target Offense.

50.     Altogether, and including my knowledge of T-Mobile, Verizon and Charter Communications Inc., I believe there is probable cause of there being

18

records associated with the **Subject Accounts** that contain evidence of the Target Offense.

*Request for "Per Call Measurement Data"*

51.    I also know that different providers use the speed with which signals travel between cell phones and cell towers ("per call measurement data," or "PCMD"), as well as other data, to better calculate and record the location of phones accessing their networks. Different providers may use different terminology to describe PCMD. For example, T-Mobile, Verizon and Charter Communications Inc. uses "timing advance" data, "true-call" data, and "quantum" data.

52.    Given these facts, I seek a warrant to search the **Subject Accounts** for the records and information in their corresponding Attachment B.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

53.    The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

*James N. Escalante*

James N. Escalante
FBI Task Force Officer

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 7th day of February, 2025.

*Allison H. Goddard*

HON. ALLISON H. GODDARD
United States Magistrate Judge

## **Attachment A-1**
## **Property to Be Searched**

T-Mobile hosts the electronic communication account associated with the cellular telephone number: (760) 562-4468 that is the subject of this search warrant and search warrant application **(Subject Account 1)**.

T-Mobile is an electronic communication service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at 4 Sylvan Way, Parsippany, New Jersey 07504.

# **ATTACHMENT B**

## I. **Service of Warrant**

The officer executing the warrant shall permit the Provider in Attachment A, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II. **Items to be Seized**

Agents shall seize the following records, data, and information covering January 10, 2025, through and including January 28, 2025, and maintained by the Provider for the subject accounts identified in Attachments A:

    a. Subscriber information, including:

        i. Names;
      ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
    iii. Local and long distance telephone connection records;
    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
     v. Length of service (including start date) and types of service utilized;
    vi. Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    vii. Other subscriber numbers or identities; and
   viii. Means and source of payment (including any credit card or bank account number) and billing records.

b. Records and other information about past wire or electronic communications sent or received by the subject account, including:
   i. the date and time of the communication;
   ii. the method of the communication;
   iii. the source and destination of the communication, such as the source and destination telephone numbers (call detail records), email addresses, or IP addresses;
   iv. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data communications
   v. All available PCMD reports, to include "timing advance" data, "true-call" data, and "quantum" data for January 10, 2025 through and inlcuding January 28, 2025.

which are evidence of violates of Title 18, U.S.C., Section 1119 (Foreign murder of United States Nationals) and Title 18 U.S.C., Section 2261 (Interstate Domestic Violence).